**DEREK SMITH LAW GROUP, PLLC**
Mimi D. Nielsen, Esq.
Attorney I.D. No. 339275
1628 Pine Street
Philadelphia, PA 19103
Phone: (215) 391-4790
Email: mimi@dereksmithlaw.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JILL S. JOHNSON,<br><br>Plaintiff,<br><br>v.<br><br>EVOLUTION US LLC and EVOLUTION NEW JERSEY LLC,<br><br>Defendants. | Civil Action No.<br><br>**PLAINTIFF DEMANDS A TRIAL BY JURY** |

## COMPLAINT AND DEMAND FOR TRIAL BY JURY

Plaintiff Jill S. Johnson ("Plaintiff" or "Ms. Johnson"), by and through her attorneys, Derek Smith Law Group, PLLC, brings this action against Defendants Evolution US LLC and Evolution New Jersey LLC (collectively, "Evolution Gaming," "Defendant," or "Defendants"), and alleges upon personal knowledge as to herself and her own acts, and upon information and belief as to all other matters, as follows:

## INTRODUCTION

1. Plaintiff Jill S. Johnson is a practitioner of Ifa, a Yoruba religious tradition. As part of her initiation, a priest placed a consecrated beaded bracelet, known as an Ide, on her left wrist during a religious ceremony. Under the tenets of her faith, the Ide is never to be removed until death.

2. Defendants Evolution US, LLC and Evolution New Jersey LLC d/b/a Evolution Gaming operate a live casino gaming studio at 1500 Spring Garden Street in Philadelphia, Pennsylvania, where games are dealt on camera and streamed to remote players. Defendant employed Plaintiff as a Game Presenter, a live dealer position, at a base rate of approximately $17.00 per hour plus gratuities, working approximately forty (40) hours per week.

3. Plaintiff brings this action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. Section 2000e et seq., and seeks back pay, front pay, compensatory damages for emotional distress, punitive damages, attorneys' fees and costs, and equitable relief.

## **JURISDICTION AND VENUE**

4. This Court has subject matter jurisdiction pursuant to 28 U.S.C. Section 1331, because this action arises under the laws of the United States, and pursuant to 28 U.S.C. Section 1343(a)(4), because this action seeks damages and equitable relief under an Act of Congress providing for the protection of civil rights.

5. This Court has jurisdiction over Plaintiff's Title VII claims pursuant to 42 U.S.C. Section 2000e-5(f)(3).

6. This Court has authority to grant declaratory relief pursuant to 28 U.S.C. Sections 2201 and 2202, and to award attorneys' fees and costs pursuant to 42 U.S.C. Section 2000e-5(k).

7. Venue is proper in this District pursuant to 42 U.S.C. Section 2000e-5(f)(3), because the unlawful employment practices alleged herein were committed within this District at Defendant's Philadelphia studio located at 1500 Spring Garden Street, Philadelphia, Pennsylvania 19130, because the employment records relevant to those practices are maintained and administered within this District, and because Plaintiff would have continued to work within this District but for the unlawful conduct alleged herein.

8. Venue is also proper pursuant to 28 U.S.C. Section 1391(b), because Defendant maintains a place of business in and is subject to personal jurisdiction in this District, and because a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

**PARTIES**

9. Plaintiff Jill S. Johnson is an adult individual and a citizen of the Commonwealth of Pennsylvania, residing at 250 Washington Street, Apt. 2, Morrisville, Bucks County, Pennsylvania 19067.

10. At all times relevant to this Complaint, Plaintiff was an "employee" of Defendant within the meaning of 42 U.S.C. Section 2000e(f).

11. Plaintiff is a practitioner of Ifa, a religion within the meaning of 42 U.S.C. Section 2000e(j), and at all relevant times held sincere religious beliefs and observed sincere religious practices, including the wearing of the Ide.

12. Defendant Evolution US, LLC is a limited liability company that transacts business in this Commonwealth and is registered to do business here. Defendant maintains a place of business at 1500 Spring Garden Street, Philadelphia, Pennsylvania 19130-4067. Defendant issued Plaintiff's religious accommodation determination on Evolution US, LLC letterhead bearing that address, and does business under the name Evolution Gaming.

13. Defendant Evolution New Jersey LLC is a limited liability company that, upon information and belief, maintains a principal place of business at 500 Boardwalk, Atlantic City, New Jersey 08401. Upon information and belief, Evolution New Jersey LLC was Plaintiff's employer of record, and Evolution New Jersey LLC and Evolution US, LLC jointly employed Plaintiff and operated as a single, integrated enterprise under the name Evolution Gaming at all relevant times.

14. At all times relevant to this Complaint, Defendant was an "employer" within the meaning of 42 U.S.C. Section 2000e(b), in that it was engaged in an industry affecting commerce and employed fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year.

15. At all times relevant to this Complaint, Defendant acted by and through its agents, servants, supervisors, managers, and employees, including but not limited to Suzan DuBois, Leave of Absence Administrator USA; the Human Resources ("HR") representative identified in correspondence as Meghan; Tyler Gibson, academy trainer; the team manager identified as Alex; Darryl Blodgett, manager; Jacqualyn Horbury, manager; the floor supervisor known to Plaintiff as "Speedy," surname Garcia; the HR or scheduling employee identified to Plaintiff as Ashley; and Shanee Jones, each of whom acted within the course and scope of employment and in furtherance of Defendant's business, such that Defendant is liable for their conduct under principles of respondeat superior and agency.

## ADMINISTRATIVE EXHAUSTION

16. Plaintiff has satisfied all administrative prerequisites to the filing of this action.

17. On or about June 15, 2026, Plaintiff filed a verified Charge of Discrimination against Evolution Gaming, 1500 Spring Garden Street, Philadelphia, Pennsylvania 19130, with the United States Equal Employment Opportunity Commission ("EEOC"), Philadelphia District Office. The Charge was assigned Charge Number 530-2026-07341.

18. Plaintiff's Charge checked the box for discrimination based on Religion and identified Evolution Gaming as the employer.

19. Plaintiff's Charge was filed within three hundred (300) days of her termination on October 2, 2025, and of the hostile work environment to which Plaintiff was subjected through that date, as required by 42 U.S.C. Section 2000e-5(e)(1).

20. On July 13, 2026, the EEOC issued a Determination and Notice of Rights to Plaintiff with respect to Charge Number 530-2026-07341, signed by Karen McDonough, Deputy Director, notifying Plaintiff of her right to sue. A true and correct copy of the Notice is attached hereto as Exhibit B.

21. The Notice of Right to Sue was transmitted with copies to Sara Gettings, Evolution Gaming, 1500 Spring Garden Street, Philadelphia, Pennsylvania 19130; Aubree Kugler, Evolution, 1000 Town Center, Suite 2800, Southfield, Michigan 48075; and Evolution Gaming, 1500 Spring Garden Street, 4th Floor, Philadelphia, Pennsylvania 19130. Defendant accordingly received actual notice of the Charge and shares an identity of interest with the entity named in the Charge.

22. Plaintiff received the Notice of Right to Sue on or about July 13, 2026, and this Complaint is filed within ninety (90) days of her receipt thereof, as required by 42 U.S.C. Section 2000e-5(f)(1).

23. The claims asserted in this Complaint are within the scope of Plaintiff's Charge and of the investigation that reasonably could be expected to grow out of that Charge.

## MATERIAL FACTS

### A. Plaintiff's Religion and the Ide

24. Plaintiff is a practitioner of Ifa, a Yoruba religious tradition rooted in wisdom, spiritual knowledge, ethical living, and harmony between humanity, nature, and the divine. The

tradition teaches that each person has a sacred destiny and emphasizes living in accordance with moral responsibility, community, and spiritual balance.

25. As part of her religious initiation, Plaintiff participated in a ceremony during which a priest placed a consecrated beaded bracelet, known as an Ide, on her left wrist.

26. An Ide is a small, unobtrusive beaded bracelet. Plaintiff's is made of green and brown beads, measuring no more than approximately one-half inch wide. Because of its size and appearance, the Ide is not distracting, does not interfere with Plaintiff's job duties, and is not readily noticeable unless specifically scrutinized.

27. Plaintiff has worn the Ide continuously for an extended period of time. Under the tenets of Plaintiff's faith, the Ide is a sacred object that is worn continuously. An Ide can only be removed under two circumstances: by a priest or by death. Removing it is not a permissible option for Plaintiff.

28. Plaintiff's religious beliefs regarding the Ide are sincerely held.

**B. Plaintiff's Employment as a Game Presenter**

29. On or about May 17, 2025, Defendant hired Plaintiff as a Game Presenter at its Philadelphia studio located at 1500 Spring Garden Street.

30. A Game Presenter is a live dealer who deals casino table games on camera, which are streamed in real time to remote players.

31. Plaintiff's base rate of pay was approximately $17.00 per hour. With gratuities, her effective rate of pay was approximately $22.00 per hour. She was scheduled to work approximately forty (40) hours per week, including overnight shifts from approximately 11:00 p.m. to 7:00 a.m.

32. Before being assigned to the gaming floor, Plaintiff completed Defendant's training program, referred to as the academy ("the Academy").

33. Defendant maintains a policy restricting jewelry worn by Game Presenters on camera. That policy is not absolute. Defendant permits Game Presenters to wear wedding rings, earrings, and necklaces on camera.

34. During the Academy, Plaintiff disclosed to Defendant that she wears the Ide on her left wrist, that it was placed there by a priest during a religious ceremony, and that it cannot be removed.

35. On the night after Plaintiff completed the Academy, and before her first overnight shift on the gaming floor, Plaintiff received verbal approval from management, communicated to her by Mr. Tyler Gibson, permitting her to wear the Ide.

36. Mr. Gibson stated only that she should wear a cardigan to "cover it up." At no point did Mr. Gibson indicate that Plaintiff's Ide was an issue for Defendant or that it would become one after the Academy.

37. In reliance on that approval, Plaintiff worked on the gaming floor wearing the Ide.

38. In reliance on Defendant's assurances, and because Defendant gave Plaintiff no reason to believe the Ide remained a problem, Plaintiff reasonably understood that wearing the cardigan was an accepted accommodation.

**C. Defendant Targets Plaintiff's Faith**

39. After Defendant approved Plaintiff's religious accommodation and assigned her to the gaming floor, Plaintiff was not treated as an employee with approved accommodation. Instead, she was immediately targeted because she continued wearing the Ide in accordance with her faith.

40. Almost immediately upon being placed out on the gaming floor, floor supervisors began scrutinizing Plaintiff's wrist and confronting her whenever the Ide became visible, even though Defendant had approved her request to wear it under her uniform-issued cardigan.

41. These confrontations were not isolated. Floor supervisors repeatedly singled Plaintiff out during her shifts, demanded that she remove the Ide, and told her in substance that she could not wear it, despite knowing or having reason to know that the Ide was a sacred religious article that Plaintiff's faith forbids her to remove.

42. Each time floor supervisors confronted Plaintiff about the Ide, Plaintiff explained its religious significance, including that it had been placed on her wrist during a religious ceremony, that it was sacred to her Ifa faith, and that she was religiously forbidden from removing it. Rather than respect Plaintiff's repeated explanations or address the failure of the cardigan accommodation, Defendant's floor supervisors continued to treat the Ide as a rule violation and continued pressuring Plaintiff to remove it.

43. Defendant's conduct made it clear that the accommodation was illusory. Although Defendant purported to approve Plaintiff's religious practice, its floor supervisors treated that same practice as misconduct on the gaming floor.

44. Defendant further intensified the harassment by docking Plaintiff's evaluation points whenever the Ide became visible, even though the visibility resulted from the ineffective cardigan accommodation Defendant itself selected and imposed.

45. As a result, Plaintiff was forced to work under constant scrutiny, repeatedly defend her religious practice to floor supervisors, and attempt to perform her duties while also trying to keep the cardigan sleeve from riding up during ordinary dealing movements.

46. Defendant's immediate targeting of Plaintiff after she went out on the gaming floor demonstrates that Defendant was not genuinely attempting to accommodate Plaintiff's religion, but was instead using the failed accommodation as a basis to harass, discipline, and ultimately punish her for wearing the Ide.

**D. The July 11, 2025, Removal and Forced Unpaid Leave**

47. On or about July 11, 2025, without warning, management pulled Plaintiff off the gaming floor and informed her that she was barred from working until she completed a formal Religious Workplace Accommodation Request Form.

48. Earlier during that same shift, Plaintiff had been pulled from the gaming floor to meet with the overnight shift manager who worked Plaintiff's 11:00 p.m. to 7:00 a.m. shift. That manager reviewed a list of Plaintiff's "mistakes" with her on his laptop, discussed them with her, and returned her to the gaming floor. He issued no written discipline and advised Plaintiff of none.

49. When Plaintiff was then summoned to the same manager's office a second time, and not in connection with the "mistakes" that had already been discussed and closed out, Plaintiff was told she was required to complete an accommodation form and could not return to work until a determination was made.

50. Notwithstanding that no written discipline was issued to or disclosed to Plaintiff on July 11, 2025, the Separation of Employment letter lists a documentation entry dated 7/11/25 for "Dealing Technique."

51. These actions demonstrate Defendant's attempt to create a pretextual record for Plaintiff's eventual separation by retroactively characterizing the same July 11, 2025, meeting as a performance issue, even though Plaintiff was not issued written discipline, was not told she

was being disciplined, and was instead removed from work because of her religious accommodation request.

52. Defendant did not permit Plaintiff to continue working while her request was processed, did not offer her any interim accommodation, and did not offer her any alternative assignment.

53. Instead, Defendant placed Plaintiff on involuntary, unpaid leave. Plaintiff did not request leave and never signed a leave of absence form and never signed any other document authorizing or memorializing her removal from the schedule.

54. On or about July 11, 2025, that very same day, Plaintiff completed and signed Defendant's Religious Workplace Accommodation Request Form in order to accelerate her return to work as quickly as possible.

55. On the Form, Plaintiff identified her religion as Ifa, described its daily prayers and rituals, and stated that she had undergone a religious ceremony at which she was given the Ide, "a religious talisman that is worn on my wrist that is never to be removed until death."

56. On the Form, Plaintiff identified the conflicting work requirement as Defendant's rule that no bracelets are permitted, which conflicts with the Ide that sits on her wrist.

57. On the Form, Plaintiff requested as her primary accommodation that she be permitted to wear a uniform-approved cardigan with long sleeves covering her arms and wrist.

58. In response to the Form's question asking what other alternative accommodation options might address her needs, Plaintiff wrote that the alternative would be a change in uniform that covers her arms and wrist completely.

59. That alternative referred to the shirt, pants, and bow tie uniform. These are uniforms that Defendant already maintained and issued to other Game Presenters.

60. From on or about July 11, 2025, through on or about August 6, 2025, Plaintiff performed no work for Defendant and received no wages. Defendant's payroll records, maintained through MyADP, reflect zero working hours during this period.

61. Defendant had verbally approved Plaintiff's wearing of the Ide in June 2025 and had permitted her to work in reliance on that approval for approximately one month. The July 11, 2025, removal did not arise from any new information about Plaintiff's religious practice. Its operative effect was to remove Plaintiff from the schedule, without pay, on the basis of the same religious article Defendant had already approved.

62. On or about July 22, 2025, Plaintiff emailed Defendant's Leave of Absence department at LoaUsa@evolution.com, writing that it was imperative that she know the next steps because her evaluation was showing that she was losing points and in violation.

63. During the same period, Plaintiff also contacted Defendant's HR representative, Meghan, seeking a status update on her pending request.

64. While Plaintiff was not present at Defendant's premises and performed no work on July 22, 2025, Defendant nevertheless recorded a documentation entry against Plaintiff dated 7/22/25 for "Manager Marked Mistakes."

65. On or about August 5, 2025, Plaintiff emailed the Leave of Absence department, writing that she hoped the decision was good news "in light of the waiting I was positioned in without pay."

**E. The August 6, 2025, Accommodation and Its Known Failure**

66. On or about August 6, 2025, Suzan DuBois, Leave of Absence Administrator USA, emailed Plaintiff and informed her that she had been cleared to return to work that night and that her religious accommodation letter would follow before the end of the day.

67. Defendant transmitted to Plaintiff a religious accommodation determination letter on Evolution US, LLC letterhead, signed by Ms. DuBois. A true and correct copy of the letter is attached hereto as Exhibit C. The letter bears a typed date of May 6, 2025, but reflects transmission to Plaintiff on August 6, 2025.

68. Defendant's August 6, 2025, determination reinstated the identical uniform-issued cardigan that had already proven ineffective in June and early July 2025, imposed no new or additional measure of any kind, and did not address the alternative uniform Plaintiff had identified on Defendant's own form, notwithstanding that Defendant maintained and issued other uniform options that would have resolved the conflict.

69. The letter stated that Defendant had received Plaintiff's request to wear a religious bracelet, the Ide, "which, as stated, is not to be removed until death," and that Defendant approved the accommodation effective immediately through August 6, 2026.

70. The letter imposed an express condition: Plaintiff was "permitted to wear the bracelet under the condition that it remains covered at all times by your uniform-issued cardigan while on the gaming floor."

71. Defendant granted only the cardigan option. Defendant did not grant, evaluate, or respond to the alternative uniform option Plaintiff had identified on the Form.

72. Defendant clearly knew that the cardigan did not work.

73. Before and after issuing the August 6, 2025, accommodation letter, Defendant knew the cardigan did not work because floor supervisors repeatedly observed and penalized Plaintiff when the too-large sleeve slipped and exposed the Ide. By granting only that ineffective accommodation, refusing workable uniform alternatives, and then using the predictable

exposure of the Ide as performance discipline, Defendant created a pretextual basis to terminate Plaintiff because of her religion.

74. The accommodation Defendant selected therefore failed to eliminate the conflict between Plaintiff's religious observance and Defendant's uniform rule, and instead placed Plaintiff in continuous violation of the condition Defendant had imposed.

**F. Ongoing Harassment and Point Deductions**

75. After Plaintiff returned to the gaming floor, religious discrimination only escalated. Floor supervisors confronted her approximately twice per shift regarding the Ide and demanded, in substance, that she take it off and that she could not wear it.

76. These confrontations occurred notwithstanding that Defendant had approved Plaintiff's accommodation in writing.

77. Following Defendant's August 6, 2025, written approval, these same floor supervisors treated Plaintiff with coldness and directed dirty looks at her, conduct they had not displayed toward her in June 2025 when they were first advised of the verbal approval. Upon information and belief, the change in their conduct followed communications from Defendant's management regarding Plaintiff's accommodation.

78. Defendant docked evaluation points from Plaintiff each time the Ide became visible, treating her religious observance as a performance deficiency.

79. By converting visibility of the approved Ide into evaluation deductions, Defendant manufactured a disciplinary record from the predictable failure of its own accommodation. Defendant then relied on that manufactured record as purported performance evidence, rather than addressing the accommodation failure that caused the deductions in the first place.

80. Upon information and belief, Plaintiff's Game Presenter evaluation score was reduced from 100 to 80 as a result of point deductions attributable to the Ide, which occurred because Defendant had never documented the approval of her accommodation in her evaluation record.

81. On or about the night of October 1, 2025, a floor supervisor again directed Plaintiff to remove the Ide.

82. Of the floor supervisors who directed Plaintiff to remove the Ide, the most persistent were a supervisor known to Plaintiff as "Speedy," surname Garcia, and another female supervisor. Approximately six to seven floor supervisors rotated through the gaming pits during Plaintiff's shifts, and Plaintiff does not presently recall the names of all of them.

83. Plaintiff reported this treatment to team manager Alex Rivera. Mr. Rivera told Plaintiff that he would speak with the floor supervisors. Defendant took no corrective action, and the conduct continued.

84. Plaintiff did not further escalate the floor supervisors' conduct at the time because she feared losing her employment and instead continued to perform her duties while enduring the treatment described above.

**G. Defendant's Refusal of the Alternative Uniform**

85. On or about September 9, 2025, Plaintiff emailed Defendant's HR department requesting a change of uniform, because floor supervisors were continuing to direct her to remove the Ide and because evaluation points were continuing to be deducted from her score notwithstanding Defendant's written approval. Plaintiff asked to be issued the shirt, pants, and bow tie uniform option.

86. Mr. Rivera confirmed to Plaintiff that the shirt, pants, and bow tie uniform was an available option, acknowledged the problem Plaintiff had identified, and directed Plaintiff to come to the office to complete the paperwork necessary to begin the process.

87. The Separation of Employment letter lists a documentation entry dated 8/9/25 for "Dealing Technique," the same date on which Plaintiff requested the alternative uniform.

88. Because the points deducted from Plaintiff's evaluation were attributable to the visibility of an article Defendant had approved in writing, those deductions should not have been assessed against her at all.

89. On or about September 9, 2025, Plaintiff emailed Defendant's Pennsylvania HR department at hrpa@evolution.com with the subject line "Uniform change request," writing that more coverage was needed on her wrist because the cardigan was not successfully covering it and because she was getting points deducted from her evaluation.

90. Again, Plaintiff was forced to remedy her own accommodation because of Defendant's failure to engage in any meaningful process with her.

91. In that email, Plaintiff stated that she had been approved to cover her religious bracelet, that Mr. Rivera was aware of the issue and had advised her to contact HR, and that the shirt, pants, and bow tie option was an option she had already included in the request form as an accommodation when asked for another option.

92. Upon information and belief, Defendant issues standard uniforms to Game Presenters on request from a manager, without an approval or paperwork process.

93. Rather than issue Plaintiff the shirt, pants, and bow tie uniform, Defendant required her to undertake an additional approval and paperwork process.

94. During this process, Plaintiff was told by Defendant's management that the shirt, pants, and bow tie uniform was reserved for women whose sexual orientation or gender identity was categorized as "other," that she was not permitted to wear that uniform unless she changed her stated orientation, and that if Defendant found she had been dishonest about her sexual or gender orientation, it would result in immediate termination.

95. Defendant thereby conditioned Plaintiff's access to a uniform that would have effectively accommodated her religious practice on a change in her stated sexual orientation.

96. Plaintiff continued to seek assistance by email with Meghan and with Suzan DuBois. Meghan advised Plaintiff that the matter was one for Ms. DuBois of the Leave of Absence department. Nothing came of the exchange, and Defendant provided no accommodation.

97. On or about September 11, 2025, at approximately 2:40 p.m., the HR representative wrote to Plaintiff that she had spoken with the manager and the Leave of Absence team, and suggested that Plaintiff speak with the Uniform Specialist to obtain a bigger cardigan to see if that would cover the bracelet, stating that "the accommodation that was approved was based on it being covered by the cardigan."

98. At approximately 2:43 p.m. that same day, Plaintiff responded that the cardigan she had was already the biggest available, and asked what the next step was if that was the only option.

99. At approximately 2:49 p.m., the HR representative responded that Plaintiff might be able to have the cardigan altered to make it a bit longer and should speak with the Uniform Specialist to approve the alteration.

100. At approximately 3:25 p.m., the HR representative wrote that if that did not work, the Leave of Absence department was looking into other avenues.

101. Defendant never provided Plaintiff with any alternative accommodation. Defendant never issued her the alternative uniform, never completed any alteration, and never identified any other avenue. Defendant's process simply stopped.

102. Moreover, Defendant had previously placed Plaintiff at the "Hollywood" Casino Tables, where Game Presenters were permitted to wear pants and a polo shirt rather than the standard uniform requiring a cardigan.

103. Defendant offered both short-sleeve and long-sleeve polo options for that assignment.

104. Plaintiff had worked the Hollywood Casino Tables while wearing the long-sleeve polo shirt, and that uniform successfully covered her Ide without interfering with her job duties. Defendant therefore knew, from Plaintiff's own prior work experience, that a readily available uniform option existed that would have accommodated Plaintiff's religious practice.

105. Despite that knowledge, Defendant did not offer the Hollywood Casino Tables uniform, the long-sleeve polo shirt, or placement at the Hollywood Casino Tables as an accommodation alternative.

106. Defendant's refusal to provide a uniform and assignment it had already made available to Plaintiff supports the inference that Defendant was not attempting in good faith to accommodate Plaintiff's religion but instead was denying her a workable accommodation because of her religious observance.

107. Throughout this period, Plaintiff continued to work in the ineffective cardigan while Defendant continued to dock her evaluation points for the resulting exposure of the Ide.

108. On or about September 29, 2025, Plaintiff sustained an injury to her hand in the course of performing her job duties.

109. Plaintiff's injury was a locking of the thumb, a condition commonly known as trigger finger. Upon information and belief, the condition was a direct result of the repetitive card dealing and shuffling required of a Game Presenter. The condition impaired Plaintiff's ability to deal and to shuffle cards.

110. Plaintiff reported the injury to her manager, Darryl Blodgett, and told him that she was making mistakes because of her injured finger.

111. Mr. Blodgett responded that the same thing had happened to him and told Plaintiff to do exercises. Upon information and belief, Defendant did not initiate any workers' compensation report or injury protocol.

112. Plaintiff thereafter took a sick day, which Defendant granted.

**H. Plaintiff's Termination**

113. Plaintiff was not scheduled to work on Wednesday, October 1, 2025. Plaintiff reported to Defendant's studio that night in error, having confused her days; her scheduled shift was Thursday, October 2, 2025.

114. Upon arriving, Plaintiff went to the office and advised Defendant's employee Ashley that she was not on the schedule. Ashley instructed Plaintiff to wait. Plaintiff waited approximately thirty minutes.

115. Rather than send Plaintiff home, Defendant assigned her to a gaming table for a shift she had not been scheduled to work. Defendant did so notwithstanding that Plaintiff had reported a hand injury to Mr. Blodgett two days earlier, and notwithstanding that Defendant had already prepared Plaintiff's Separation of Employment letter, dated September 29, 2025.

116. Plaintiff's injured thumb caused her to make mistakes during that unscheduled shift. During that shift Plaintiff reached thirty (30) mistakes, the monthly threshold identified in

Defendant's policy. Plaintiff was pulled from the gaming floor and sent home at approximately 2:00 a.m. Later that same morning, Jacqualyn Horbury telephoned Plaintiff to inform her that her employment was terminated and advised that a Separation of Employment letter had been sent to her by email.

117. On or about October 2, 2025, Defendant unlawfully and wrongfully terminated Plaintiff's employment by telephone.

118. The Separation of Employment letter, dated September 29, 2025, asserted that Plaintiff had made sixty-eight (68) mistakes between July 1, 2025, and September 29, 2025, and listed prior documentation entries that included July 11, 2025, the date Defendant removed Plaintiff from the gaming floor because of the Ide, and July 22, 2025, a date on which Defendant had barred Plaintiff from working and on which she performed no work.

119. The Separation of Employment letter further asserted that Plaintiff had been "on the floor for 25 days, which falls within the 90-day probationary period." That assertion was false. Plaintiff began her employment with Defendant in May 2025, more than ninety (90) days before her termination, and worked on the gaming floor from June 2025 through September 2025, except during the period in which Defendant barred her from working.

120. On October 2, 2025, the day of her termination, Plaintiff emailed Defendant's Human Resources department, complaining of the "push back for my religious bracelet," stating that a floor supervisor had told her "just last night to take it off," and stating that her Game Presenter evaluation score had been reduced from 100 to 80 because her accommodation approval had not been documented.

**COUNT I**
**Title VII, 42 U.S.C. Section 2000e et seq.**
**Religious Discrimination: Failure to Accommodate**
**(Against Defendant Evolution Gaming)**

121. Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

122. Title VII makes it unlawful for an employer to discharge any individual, or otherwise to discriminate against any individual with respect to her compensation, terms, conditions, or privileges of employment, because of such individual's religion. 42 U.S.C. Section 2000e-2(a)(1).

123. The term "religion" under Title VII includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that it is unable to reasonably accommodate an employee's religious observance or practice without undue hardship on the conduct of the employer's business. 42 U.S.C. Section 2000e(j).

124. Plaintiff holds a sincere religious belief, as a practitioner of Ifa, that the Ide placed on her wrist during a religious ceremony must never be removed until death.

125. That belief conflicts directly with Defendant's job requirement that Game Presenters not wear bracelets on camera.

126. Plaintiff informed Defendant of the conflict during the academy, again in writing on Defendant's Religious Workplace Accommodation Request Form on or about July 11, 2025, and repeatedly thereafter, including in her emails of July 22, 2025, August 5, 2025, and September 9 through 11, 2025.

127. Defendant subjected Plaintiff to adverse employment actions because of the conflict, including removing her from the gaming floor on or about July 11, 2025, placing her on an

involuntary unpaid leave of approximately four weeks, docking her evaluation points each time the Ide became visible, and terminating her employment on or about October 2, 2025.

128. The only accommodation Defendant granted, the uniform-issued cardigan, did not eliminate the conflict. Because Plaintiff deals with her left hand and wears the Ide on her left wrist, the cardigan sleeve rode up in the ordinary course of her duties and exposed the Ide, placing Plaintiff in continuous violation of the very condition Defendant imposed.

129. Defendant was on actual notice that the cardigan did not work, and was informed in writing on September 11, 2025, that Plaintiff's cardigan was already the largest available. Defendant responded only that it might be altered and that its Leave of Absence department would look into other avenues. Defendant then took no further action.

130. Plaintiff identified an alternative accommodation on Defendant's own form, namely the shirt, pants, and bow tie uniform that Defendant already stocked and issued to other Game Presenters. Defendant refused to provide it and instead conditioned access to that uniform on Plaintiff changing her stated sexual orientation.

131. Defendant failed to engage in a good faith interactive process to identify a workable accommodation.

132. Defendant cannot demonstrate that providing Plaintiff with a uniform it already stocked, or otherwise permitting her to wear a sacred bracelet on her wrist, would have resulted in substantial increased costs in relation to the conduct of its particular business. Defendant already permits Game Presenters to wear wedding rings, earrings, and necklaces on camera.

133. As a direct and proximate result of Defendant's violation of Title VII, Plaintiff has suffered the damages described herein.

134. Defendant's conduct was undertaken with malice or with reckless indifference to Plaintiff's federally protected rights, entitling Plaintiff to punitive damages pursuant to 42 U.S.C. Section 1981a(b)(1).

**COUNT II**
**Title VII, 42 U.S.C. Section 2000e et seq.**
**Religious Discrimination: Disparate Treatment and Discriminatory Discharge**
**(Against Defendant Evolution Gaming)**

135. Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

136. Plaintiff is a member of a protected class in that she is a practitioner of Ifa and holds sincere religious beliefs protected by 42 U.S.C. Section 2000e(j).

137. Plaintiff was qualified for the Game Presenter position. She completed Defendant's academy, was assigned to the gaming floor, and performed her duties.

138. Plaintiff suffered adverse employment actions, including removal from the gaming floor, an involuntary unpaid leave of approximately four weeks, repeated deductions of evaluation points, denial of a uniform routinely issued to other Game Presenters, and termination of her employment.

139. These adverse actions occurred under circumstances giving rise to an inference of religious discrimination, including that (i) Defendant permits Game Presenters to wear wedding rings, earrings, and necklaces on camera but refused to permit Plaintiff to wear a religious bracelet, (ii) Defendant docked Plaintiff's evaluation points specifically because her religious article became visible, (iii) Defendant's floor supervisors repeatedly demanded that Plaintiff remove her religious article notwithstanding a written accommodation, (iv) Defendant issues standard uniforms on request but subjected Plaintiff to an extended approval process for a uniform she needed for religious reasons, and (v) Defendant's stated reasons for termination are

demonstrably false, including its reliance on performance mistakes attributed to dates on which Plaintiff was barred from the premises and its assertion of a probationary status that had already expired.

140. Plaintiff's religion was a motivating factor in Defendant's decision to subject her to the adverse employment actions described above. 42 U.S.C. Section 2000e-2(m).

141. As a direct and proximate result of Defendant's violation of Title VII, Plaintiff has suffered the damages described herein.

142. Defendant's conduct was undertaken with malice or with reckless indifference to Plaintiff's federally protected rights, entitling Plaintiff to punitive damages pursuant to 42 U.S.C. Section 1981a(b)(1).

**COUNT III**
**Title VII, 42 U.S.C. Section 2000e et seq.**
**Religious Discrimination: Hostile Work Environment**
**(Against Defendant Evolution Gaming)**

143. Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

144. Plaintiff suffered intentional discrimination because of her religion.

145. The discriminatory conduct was pervasive. Floor supervisors confronted Plaintiff approximately twice per shift, over a period of approximately two months following her return to work on or about August 6, 2025, demanding that she remove a sacred religious article that her faith forbids her to remove. Defendant simultaneously imposed a point deduction against her performance record on each occasion the article became visible, so that the harassment carried a concrete and cumulative employment penalty.

146. The conduct was also severe. Defendant conditioned Plaintiff's access to the only uniform that would have resolved the conflict on her changing her stated sexual orientation, and

threatened her with immediate termination if it determined she had been dishonest about her orientation.

147. The conduct detrimentally affected Plaintiff, causing her emotional distress and interfering with her ability to perform her job, including by requiring her to manage her sleeve continuously while dealing.

148. The conduct would detrimentally affect a reasonable person of the same protected class in Plaintiff's position.

149. A basis for employer liability exists because the harassing conduct was committed by Plaintiff's supervisors and members of management and culminated in a tangible employment action, namely her termination, and because Defendant had actual knowledge of the conduct through Plaintiff's written complaints to its HR and Leave of Absence departments and failed to take prompt and appropriate remedial action.

150. As a direct and proximate result of Defendant's violation of Title VII, Plaintiff has suffered the damages described herein.

151. Defendant's conduct was undertaken with malice or with reckless indifference to Plaintiff's federally protected rights, entitling Plaintiff to punitive damages pursuant to 42 U.S.C. Section 1981a(b)(1).

## INJURY AND DAMAGES

As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer the loss of her career and the loss of a salary, bonuses, benefits and other compensation which such employment entails. Plaintiff has also suffered future pecuniary losses, emotional pain, physical pain, humiliation, mental anguish, suffering, inconvenience, injury to

reputation, loss of enjoyment of life, and other non-pecuniary losses. Plaintiff has further experienced severe emotional and physical distress.

## JURY DEMAND

Plaintiff Jill S. Johnson demands a trial by jury on all issues so triable pursuant to Federal Rule of Civil Procedure 38.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff Jill S. Johnson demands judgment against Defendants, jointly and severally, in an amount to be determined at the time of trial plus interest, including, but not limited to, back pay, front pay, compensatory damages, including damages for emotional distress, punitive damages, and attorneys' fees and costs pursuant to 42 U.S.C. Section 2000e-5(k); declaratory relief that Defendants' conduct violated Title VII; and such other and further relief as the Court deems just and proper.

Dated: October 8, 2026

**DEREK SMITH LAW GROUP, PLLC**
*Counsel for Plaintiff*
By: */s/ Mimi D. Nielsen*
Mimi D. Nielsen, Esquire
Derek Smith Law Group, PLLC
1628 Pine Street
Philadelphia, Pennsylvania 19103
Tel: (215) 391-4790
E-Mail: mimi@dereksmithlaw.com

## VERIFICATION

I, Jill S. Johnson, verify that I am the Plaintiff in this action and that the statements made in the foregoing Complaint are true and correct to the best of my knowledge, information, and belief. I understand that false statements herein are made subject to the penalties of 18 Pa.C.S. Section 4904 relating to unsworn falsification to authorities.

Date: 10 / 08 / 2026

**JILL S. JOHNSON**